Milton SILVERMAN, Plaintiff,

v.

CITY OF NEW YORK, Richard T. Roberts, Neil Kaplan, Mario Ferrigno, Deena R. Ghaly, Paul Navarro, Andrew Lawrence, William Abdul Khaaliq, and Phoebe Arnold, Defendants.

No. 98–CV–6277.

United States District Court,
E.D. New York.

Aug. 14, 2002.

Richard Cardinale, Cardinale Hueston & Marinelli, Brooklyn, NY, for plaintiffs.

Paul Marks, Assistant Corporation Counsel, New York City, for defendants.

### MEMORANDUM & ORDER

GLASSER, District Judge.

The defendants in this employment discrimination action—the City of New York and various individuals employed in the City's Department of Housing Preservation and Development ("HPD")—move for summary judgment dismissing plaintiff Milton Silverman's ("Silverman's") claims. For the reasons set forth below, the defendants' motion is granted.

### BACKGROUND

This action arises from Silverman's claim that he suffered discrimination on the basis of his religion, race and age while employed as a Real Estate Manager by HPD. Silverman is a white Jewish male who, at the time his claims arose in 1997, was 77 years old. (*See* Sec. Am.Compl. ¶ 7.) Silverman was hired by HPD in 1973 and worked there until his resignation in 1997.(*See id.* ¶¶ 17, 57.)

The factual allegations in the Second Amended Complaint describe Silverman as the innocent victim of a plot concocted by his former supervisors and co-workers at HPD to get him fired by falsely accusing him of sexual harassment. Silverman con-

tends that he was wrongfully accused of sexually harassing Tiffany Springer, a fifteen-year-old black woman who was working at HPD at the time as a summer intern. On July 15, 1997, Silverman was holding some money when Ms. Springer approached and asked him, in what he contends was an overly personal and disrespectful manner: "How can I get some of that money?" (*See id.* ¶ 35.) Silverman contends that he was taken aback by this comment, as he had previously had no contact with Ms. Springer, and that he responded by saying: "You must think you are cute." (*See id.* ¶ 36.) Silverman avers that his use of the word "cute" had no sexual connotations, but rather related to the fact that Ms. Springer was being a "wise guy," and that the absence of a sexual implication was objectively obvious to anyone who might have overheard the conversation, including Ms. Springer. (*See id.*) Silverman further suggests that the absence of a sexual implication was obvious to the defendants because, among other things, they were aware that he had been through a major operation several years earlier that prevented him from having any sexual function. (*See id.* ¶ 40.)

The defendants paint a very different picture of the Springer incident. The defendants assert that Silverman offered money to Springer to be his "girlfriend," and that, after offering Springer money, Silverman ran his fingers through Springer's hair. (*See* Def.'s 56.1 Stmt. ¶¶ 27–28; *see also* Def.'s Ex. 12.) After Springer and two other summer youth workers reported Silverman's actions, the defendants, aware that Silverman had a number of disciplinary incidents in the past (*see* Def.'s 56.1 Stmt. ¶¶ 13–20), accused Silverman of sexual harassment and brought him up on administrative charges with the intent of having him fired.

Thus, two days after the incident, on July 17, 1997, Silverman was called to HPD's Disciplinary Unit, where he received a notice of immediate suspension without pay. (*See* Sec. Am.Compl. ¶ 46.) Silverman also was informed by defendant Mario Ferrigno, the Deputy Director of HPD's Disciplinary Unit, that he would likely face criminal charges as a result of the incident involving Ms. Springer. (*See id.*) At some later time, which is unspecified in the Second Amended Complaint, Silverman contends that he was called in for several additional meetings with HPD officials, including officials at the Inspector General's Office and the Disciplinary Unit. (*See id.* ¶ 52.) At these meetings, Silverman pleaded with defendant Deena Ghaly, HPD's Deputy General Counsel of Labor Relations, to permit him to complete the one and a half remaining years of service that he needed in order for his pension benefits to accrue. (*See id.* ¶ 55.) Defendant Ghaly discussed the matter with defendant Richard Roberts, the Commissioner of HPD, and then denied Silverman's request to remain at HPD, threatening that if he did not resign voluntarily, he would be terminated. (*See id.*)

Apparently, some discussion took place concerning a hearing to determine whether there was just cause for Silverman's termination, but defendants Ghaly, Ferrigno and Neil Kaplan, the Director of HPD's Disciplinary Unit, informed Silverman that if he chose to go through with a hearing he was "not going to win," and that losing a hearing would be difficult to endure at his age. (*See id.* ¶ 52.) Allegedly coerced by Ghaly, Ferrigno and Kaplan, Silverman involuntarily resigned from his position at HPD. (*See id.* ¶ 57.)

Silverman contends that the investigation that led to his suspension and "forced" resignation was the result of a conspiracy in which a "racist, anti-Semitic troika" made up of defendants Paul Navarro (Deputy Director of HPD's West Manhattan

Area Office), Andrew Lawrence (a Principal Administrative Associate in HPD's West Manhattan Area Office), and Phoebe Arnold (also a Principal Administrative Associate in HPD's West Manhattan Area Office) used the incident with Ms. Springer as "an opportunity to rid themselves of the white, Jewish elderly plaintiff, who in their view did not belong in the Harlem office of HPD." (*Id.* ¶ 41.) According to Silverman, the racism and anti-Semitism of these defendants is evidenced by the fact that (i) Navarro and Lawrence, on several unspecified occasions, called Silverman a "Jew bastard" and a "Jew fuck," and asked him to explain why a "supposedly wealthy, white Jewish old man would want to work in Harlem with ... 'so many minorities'" (*id.* ¶ 24); and (ii) Arnold referred to him as the "Banker" of HPD (*id.* ¶ 26). Silverman further contends that Navarro, Arnold, and Lawrence, along with defendant William Abdul–Khaaliq (a Real Property Manager in HPD's West Manhattan Office), fabricated evidence and provided knowingly false and "stigmatizing" evidence to HPD's Disciplinary Unit and the Inspector General's Office during the course of the investigation into the Springer incident. (*See id.* ¶ 42–49.)

Sometime in 1998, after Silverman had resigned, he learned that Lawrence had been accused of sexually harassing a tenant in a property managed by HPD. (*See id.* ¶ 65.) In contrast to his own experience, Silverman contends that Lawrence was not suspended, but instead was simply required to undergo counseling. Silverman asserts that this difference in treatment resulted from the fact that Lawrence was not white, Jewish, or a senior citizen. (*See id.* ¶¶ 67–77.) Silverman further asserts that, upon filing his original com-

plaint in this action, the defendants became "worried" that they had been caught "red handed" treating Silverman more harshly than Lawrence. Silverman alleges that the defendants then engaged in a scheme whereby they had Lawrence's misconduct case reopened and had Lawrence fired for his misconduct, in order to "diminish the force" of Silverman's claims. (*See id.*)

Based on the foregoing, Silverman asserts four claims in his Second Amended Complaint. In his first claim, Silverman alleges that the defendants discriminated against him on the basis of his age, race and religion, in violation of the Fourteenth Amendment to the United States Constitution, the New York State and City Human Rights Laws, and the New York State Constitution. (*See id.* ¶ 81.) Silverman also alleges that, to the extent the defendants discriminated against him on the basis of his religion, the defendants have violated 42 U.S.C. § 1981. (*See id.*) Silverman further alleges that the City is liable under federal and state law as a result of this religious discrimination. (*See id.*) In his second claim, Silverman alleges that, as a result of the above-mentioned conduct, the defendants have violated his rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, as well as state law. (*See id.* ¶¶ 84–85.) Like his first claim, Silverman alleges that the City is liable as a result of this violation. (*See id.* ¶ 86.) In his third claim, Silverman alleges that the defendants engaged in a conspiracy to deprive him of his federal and state rights. (*See id.* ¶ 88.) Finally, in his fourth claim, Silverman alleges that the defendants defamed, libeled and slandered him. (*See id.* ¶ 90.) [1]

---

**1.** It should be noted that Silverman has amended his complaint three times. The first amendment occurred on December 24, 1998, before Silverman served the summons and complaint on the defendants. The purpose of that amendment was to add Phoebe Arnold as a defendant. *See Silverman v. City of N.Y.,*

The defendants now move for summary judgment on Silverman's claims. They assert that Silverman cannot make out a *prima facie* case of discrimination, because he cannot show that his suspension and "constructive discharge" occurred under circumstances giving rise to an inference of discrimination. (*See* Def.Mem. at 12–23.) The defendants also assert that Silverman has failed to show that there was any agreement to violate Silverman's civil rights, scuttling his conspiracy claim. (*See id.* at 23–26.)[2] Silverman responds that the record is replete with factual issues concerning whether (i) the defendants' acts occurred under circumstances giving rise to an inference of discrimination, and (ii) there was an agreement between the defendants to deprive Silverman of his civil rights. Accordingly, Silverman argues that the motion for summary judgment should be denied.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions ... together with the affidavits ... show that there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks and citations omitted). In deciding a summary judgment motion, a court need not resolve disputed issues of fact, but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States.* 841 F.2d 469, 473 (2d Cir.1988). A disputed fact is material only if it might affect the outcome of the suit under the governing law. A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a reasonable jury could return a verdict in her favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

### II. Summary Judgment Should be Granted on Silverman's First Two Claims

#### A. The framework for evaluating, Silverman's §§ 1981 and 1983 claims

■ In his first claim, brought under 42 U.S.C. § 1983, Silverman alleges that the defendants discriminated against him on the basis of his age, race and religion, in violation of the Fourteenth Amendment to

No. 98–CV–6277, 2001 WL 218943, at *2 (E.D.N.Y. Feb.2, 2001). The defendants then served Silverman with a motion to dismiss the Amended Complaint and, in response, Silverman moved for leave to amend his complaint. The Court granted that motion in part, but denied it with respect to a number of proposed claims which were futile. *See id.* at *11. Silverman then sought leave to amend his complaint yet again, asserting that he had rectified the deficiencies in his prior proposed amended complaint. The Court denied that motion in all material respects, permitting Silverman to amend his complaint only insofar as his motion for leave to amend was unopposed by the defendants. *See Silverman v. City of N.Y.,* No. 98–CV–6277, 2001 WL 1776157, at *6 (E.D.N.Y. Nov.19, 2001).

**2.** The defendants also move for summary judgment on Silverman's defamation, libel and slander claim, but Silverman agreed to withdraw that claim in his opposition papers (*see* Pl.Opp. at 2), and therefore it is unnecessary address that claim here.

the United States Constitution, as well as state law.[3] The Fourteenth Amendment, insofar as it is relevant here, provides:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The only clause of the Fourteenth Amendment implicated by Silverman's claims is the final clause, aptly named the Equal Protection Clause.[4] However, Silverman's second claim also is predicated on the Equal Protection Clause of the Fourteenth Amendment. Accordingly, the claims are, in actuality, the same, and therefore the Court will treat them together.[5]

■ A Section 1983 claim alleging an Equal Protection violation in the employment context is evaluated under the familiar *McDonnell Douglas*[6] burden-shifting framework. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (assuming that "the *McDonnell Douglas* framework is fully applicable to racial-discrimination-in-employment claims under 42 U.S.C. § 1983"); *Sorlucco v. N.Y.C. Police Dep't*, 888 F.2d 4, 7 (2d Cir.1989). The same is true with respect to Silverman's claim under Section 1981. *See Patterson v. Mc-Lean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (agreeing with lower court that *McDonnell Douglas* framework "should apply to claims of racial discrimination under § 1981"), abrogated on other grounds by Civil Rights Act of 1991; *Choudhury v. Polytechnic Inst. of N.Y.*, 735 F.2d 38, 44 (2d Cir.1984). Silverman's state-and city-law claims are also evaluated under this framework. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000); *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997).

Under *McDonnell Douglas*, the plaintiff bears the initial burden of "proving by a preponderance of the evidence a *prima facie* case of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *accord Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir.1994). In order to state a *prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he was subjected to an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. 411 U.S. at 802, 93 S.Ct. 1817; *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153–54 (2d Cir.2000). When a plaintiff establishes a

---

**3.** Silverman has not brought a claim under Title VII of the Civil Rights Act of 1964, likely because there is no individual liability under Title VII. *E.g., Weeks v. N.Y. State (Div. of Parole)*, 273 F.3d 76, 81 n. 1 (2d Cir.2001) ("individuals are not proper Title VII defendants") (citation omitted).

**4.** Silverman nowhere suggests that his claim is predicated on the Privileges or Immunities Clause, which addresses rights that are "essential attributes of national citizenship." *Carrabus v. Schneider*, 119 F.Supp.2d 221, 230 (E.D.N.Y.2000). Silverman's claim also does not implicate the Due Process Clause, as

he previously sought leave to assert such a claim, which was denied by the Court on two occasions. *See Silverman v. City of N.Y.*, No. 98–CV–6277, 2001 WL 1776157, at *6 (E.D.N.Y. Nov.19, 2001); *Silverman v. City of N.Y.*, No. 98–CV–6277, 2001 WL 218943, at *2 (E.D.N.Y. Feb.2, 2001).

**5.** For this reason, Silverman's argument that the defendants have failed to address his second claim (*see* Pl.Opp. at 55–57) misses the mark.

**6.** *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*prima facie* case, he "in effect creates a presumption that the employer unlawfully discriminated against" him. *St. Mary's,* 509 U.S. at 506, 113 S.Ct. 2742.

Once a *prima facie* case is established, the burden shifts to the defendant to rebut the presumption of discrimination by providing a legitimate, non-discriminatory reason for the employment decision. *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089; *Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 (2d Cir.2000). If the defendant articulates a legitimate, non-discriminatory reason, the *McDonnell Douglas* framework—and its presumptions and burdens—drops out of the picture. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142–43, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff then must establish that the defendant's articulated reason is a pretext for discrimination. *Id.* at 143, 120 S.Ct. 2097.

B. *Was Silverman constructively discharged?*

■ The defendants concede that Silverman has satisfied the first two elements of his *prima facie* case under *McDonnell Douglas.* (*See* Def.Mem. at 6.) The defendants also concede that the third element of the *prima facie* case—namely, that Silverman was subjected to an adverse employment action—is satisfied vis-a-vis Silverman's 30–day suspension. The defendants dispute, however, whether Silverman can establish the third element with respect to his constructive discharge claim, because they argue that he was not constructively discharged.

■ "[C]onstructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily." *Flaherty v. Metromail Corp.,* 235 F.3d 133, 138 (2d Cir.2000) (citation omitted). Thus, a plaintiff alleging

constructive discharge has a "high threshold to meet." *Carlucci v. Kalsched,* 78 F.Supp.2d 246, 256 (S.D.N.Y.2000). Here, Silverman bases his constructive discharge claim on the defendants' alleged threats to have him terminated if he did not resign, resulting in the loss of his pension benefits and health insurance. The defendants argue that these threats cannot amount to a constructive discharge, because Silverman had rights under both his union's collective bargaining agreement and New York Civil Service Law § 75 to a hearing prior to his termination. Thus, the defendants argue that Silverman's discrimination claims should be limited to his 30–day suspension. (*See* Def.Mem. at 7–12; Pl.Opp. at 14–28.)

Silverman correctly points out that a number of courts in this circuit have held that threats of termination may be sufficient to establish constructive discharge. *See, e.g., Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188–89 (2d Cir.1987); *Leiman v. N.Y.,* No. 98 CIV 5538, 2000 WL 1364365, at *10 (S.D.N.Y. Sept.21, 2000), *aff'd,* 9 Fed.Appx. 37 (2d Cir.2001). Nevertheless, courts in this circuit generally have refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly "intolerable" work atmosphere leading up to his resignation, but failed to take advantage thereof. *See, e.g., Spence v. Md. Cas. Co.,* 995 F.2d 1147, 1157 (2d Cir.1993) (no constructive discharge where plaintiff "had a quite effective alternative to resignation. He could have lodged a complaint about [plaintiff's supervisor] to the Company's [Human Resources Division]"); *Mercury Air Group, Inc. v. Perez,* No. 00 CIV 2975, 2001 WL 88228, at *4 (S.D.N.Y. Jan.31, 2001) (court "cannot conclude that [plaintiff] was forced out of his job" where plaintiff "never attempted to bring what he apparently viewed to be a very serious problem to the attention of [defendant]"); *Rodriguez v.*

*Graham–Windham Servs. to Families & Children,* No. 99 CIV 10447, 2001 WL 46985, at *6 (S.D.N.Y. Jan.18, 2001) (refusing to find constructive discharge where, *inter alia.* "Rodriguez was on notice of G–W's Complaint Resolution Procedure, but made no complaint to G–W's Human Resources Department alleging discrimination or mistreatment"); *Katz v. Beth Israel Med. Ctr.,* No. 95 CIV 7183, 2001 WL 11064, at *13 (S.D.N.Y. Jan.4, 2001) (availability of grievance under collective bargaining agreement, among other things, defeated constructive discharge claim); *Stembridge v. City of N.Y.,* 88 F.Supp.2d 276, 284–85 (S.D.N.Y.2000) (no constructive discharge where "[P]laintiff had the opportunity to present his side of the story in the scheduled disciplinary hearing. It is impossible to know whether the hearing could have actually remedied the situation or address the ... misconduct because plaintiff chose not to participate in the process."); *Cleveland v. Int'l Paper Co.,* No. 96 CV 1068, 1998 WL 690915, at *5 (N.D.N.Y. Sept. 30, 1998) ("no constructive discharge exists where an employee fails to lodge complaints or take advantage of employer accommodations"); *Niles v. N.Y. Office of Mental Retardation & Dev. Disability,* No. 89–CV–598, 1996 WL 743839, at *10–11 (N.D.N.Y. Dec.20, 1996). Here, Silverman does not dispute the defendants' contention that he had rights under *both* his collective bargaining agreement *and* New York Civil Service Law § 75 to a pretermination hearing. Furthermore, there can be no doubt that Silverman was fully aware of these rights. (*See* Pl.'s Ex. 2.)[7] Thus, the fact that Silverman could have sought a hearing before being terminated

eviscerates his claim that threats of termination created an "intolerable" situation which left him with but one choice: resignation. Indeed, if it were clear "to any person who heard" Silverman's statements to Springer that he had no social or sexual intentions, as Silverman alleges (*see* Sec. Am.Compl. ¶ 36), one would expect Silverman to have availed himself of his right to a hearing. The fact that he chose not to do so is telling, and is damning to his case.[8]

For these reasons, the Court agrees with the defendants that only Silverman's 30–day suspension is potentially actionable.

### C. Who are the proper defendants?

■ The result of the foregoing discussion is that certain of the defendants cannot be held liable for the "discrimination" alleged in Silverman's first two claims. Indeed, the defendants argue—and Silverman appears to concede—that only defendants Roberts, Ghaly, Kaplan, and Ferrigno were involved in the decision to suspend Silverman. (*See* Def.Mem. at 11; Pl.Opp. at 3–4.) There are no allegations that defendants Khaaliq, Lawrence, Arnold, and Navarro had any role in the decision to suspend Silverman. Accordingly, they are not proper defendants in Silverman's discrimination claims. *See, e.g., Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001) ("[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983") (internal quotation marks and ci-

---

**7.** The Court is mindful of the fact that Silverman (i) had been through the disciplinary process on multiple prior occasions, (ii) graduated from law school and is admitted to the New York bar, and (iii) was represented by counsel prior to his resignation.

**8.** Indeed, this fact undercuts Silverman's argument that he felt compelled to resign because the defendants told him he had no chance of prevailing at a disciplinary hearing. (*See* Pl.Opp. at 20–21.)

tations omitted); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (same).

■ Silverman attempts to sidestep this fact by arguing that Khaaliq, Lawrence, Arnold and Navarro participated in the decision to suspend him by providing purportedly "false" and "stigmatizing" information about him to HPD officials and officials of the Inspector General's Office who were investigating the Springer incident. (*See* Pl.Opp. at 49–51.) This argument fails, for two reasons. First, at least some of these defendants did not provide any information to the investigators until *after* Silverman was suspended. (*See, e.g.,* Def. Reply at 13 ("Lawrence's interview by the Disciplinary Unit occurred on July 28, 1997, after plaintiff was suspended"); *id.* at 14 (Khaaliq's statements to investigators came one day after suspension).) Second, "personal involvement" in a constitutional violation (which the Second Circuit has sometimes described as "direct participation") requires a plaintiff to prove the "intentional participation *in the conduct constituting a violation of the victim's rights* by one who knew of the facts rendering it illegal." *Provost,* 262 F.3d at 155 (emphasis added). Here, the conduct "constituting a violation of [Silverman's] rights" was his suspension for 30 days, purportedly on account of his race, age, and religion. Under these facts, Khaaliq, Lawrence, Arnold and Navarro cannot be said to have "participated" in the decision to suspend Silverman, and therefore they cannot be held liable for that decision. Stated differently, and to borrow Silverman's language, none of these defendants "ordered or help[ed]" Roberts, Ghaly, Kaplan, or Ferrigno to suspend Silverman—they reached the decision to do so on their own, albeit based on information provided by some, or all, of Khaaliq, Lawrence, Arnold and Navarro. (*See* Pl.Opp. at 46.) Accordingly, the discrimination claims against them should be dismissed.

## D. *The remaining defendants are entitled to summary judgment*

As a result of the foregoing, only Roberts, Ghaly, Kaplan, and Ferrigno remain as defendants in Silverman's first two claims. These defendants next argue that Silverman cannot state a *prima facie* case of discrimination, because Silverman's suspension allegedly did not occur under circumstances giving rise to an inference of discrimination, the fourth prong of the *prima facie* case under *McDonnell Douglas.* (*See* Def.Mem. at 12–23.) The Court agrees.

The Second Circuit has repeatedly stated that the burden of establishing a *prima facie* case under *McDonnell Douglas* is "minimal." *See, e.g., Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 49 (2d Cir.2002); *McGuinness v. Lincoln Hall,* 263 F.3d 49, 53 (2d Cir.2001); *James,* 233 F.3d at 153; *see also St. Mary's,* 509 U.S. at 506, 113 S.Ct. 2742. Although this burden is not considerable, "it has substance nevertheless." *Viola v. Philips Med. Sys.,* 42 F.3d 712, 716 (2d Cir.1994); *accord Orisek v. Am. Inst. of Aeronautics & Astronautics,* 938 F.Supp. 185, 189 (S.D.N.Y.1996) (Parker, J.); *Niles,* 1996 WL 743839, at *2. Here, Silverman has not proffered sufficient evidence to satisfy his minimal burden of proving that his 30–day suspension occurred under circumstances giving rise to an inference of discrimination.

■ Silverman points to three facts which, in his opinion, satisfy this element of the *prima facie* case. First, Silverman argues that the statements of some of the defendants (referring to Silverman as a "Jew bastard" or a "Jew fuck," for example) suggest that the defendants acted out of a discriminatory animus towards him. (*See* Pl.Opp. at 32–33.) However, the Court notes that nearly all of the comments were made by either Khaaliq, Law-

rence, Arnold or Navarro. (*See id.*) The bias of these defendants, who, as set forth above, did not participate in the decision to suspend Silverman, cannot be imputed to the remaining defendants. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 137 (2d Cir. 1997); *see also Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 309 (S.D.N.Y.2000) ("it is fatal to plaintiffs' case that they only allege that McKay and Zolcinski, and not any of the decision-makers who were responsible for their termination[,] harbored discriminatory feelings for them"). Only one statement specified by Silverman can be attributed to Roberts, Ghaly, Kaplan, or Ferrigno, namely, Kaplan telling Silverman that "it was time for him to retire." (Pl.Opp. at 33.) Besides the fact that this statement is ambiguous and does not suggest bias on its face, it is insufficient, standing alone, to support an inference of discrimination. *See, e.g., Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir.2001) ("stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"); *Georgy v. O'Neill*, No. 00–CV–0660, 2002 WL 449723, at *6 (E.D.N.Y. Mar.25, 2002) ("Space's alleged reference to Georgy's Romanian origin, made more than six months before Georgy's termination, is the kind of isolated and stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment."); *see also Ponniah Das v. Our Lady of Mercy Med. Ctr.*, No. 00 CIV 2574, 2002 WL 826877, at *8 (S.D.N.Y. Apr.30, 2002) ("not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision").

■ The other two facts alluded to by Silverman which allegedly give rise to an inference of discrimination relate to the sexual harassment allegations against Lawrence. Silverman argues that the defendants treated Lawrence—who was not white, Jewish, or elderly—more leniently after he was accused of sexual harassment by an HPD tenant, despite the fact that Lawrence and Silverman were similarly situated employees. Silverman also argues that, after commencing this lawsuit, the defendants attempted to cover-up their more-lenient treatment of Lawrence by reopening his disciplinary case and having him fired. (*See* Pl.Opp. at 33–43.) These arguments do not pass muster. It is true that "[a] showing that the employer treated a similarly situated employee differently is 'a common and especially effective method' of establishing a *prima facie* case of discrimination." *McGuinness*, 263 F.3d at 53 (quoting *Abdu–Brisson*, 239 F.3d at 468). Yet it is quite clear that the defendants had substantial evidence corroborating the allegations against Silverman, including the statements of Springer and two other summer interns (*see* Def.'s Ex. 12), but they were unable to corroborate the allegations against Lawrence (*see* Pl.'s Ex. 16).[9] This fact alone justifies treating Silverman differently from Lawrence. So, too, does the fact that the Springer incident could be objectively viewed as more serious than the allegations against Lawrence. Indeed, the Springer incident concerned an underage summer intern, while the allegations of sexual harassment levied against Lawrence were made by an adult tenant with whom Lawrence had a ten-year relationship, and in which the complainant participated willingly. (*See* Pl.'s Ex. 16.) Furthermore, Lawrence ultimately was terminated, albeit after an initial recommendation that he merely be counseled, weakening Silverman's claim that Lawrence was treated differently on account of his race, age, or religion. All

---

**9.** The Inspector General's Office was unable to obtain sufficient evidence to initiate a *criminal* prosecution against Silverman. (*See* Def.'s Ex. 15.)

told, these facts lead the Court to conclude that Silverman has failed to show that his 30–day suspension occurred as a result of bias or discrimination. *See Francis v. Runyon*, 928 F.Supp. 195, 203 (E.D.N.Y. 1996) (plaintiff must establish "that the other employee's acts were of 'comparable seriousness' to [his] own infraction") (citations omitted).

█ In any event, even assuming *arguendo* that Silverman has stated a *prima facie* case of discrimination, another no-less-important reason exists for granting summary judgment in favor of these defendants: they have articulated a "legitimate, non-discriminatory" reason for Silverman's suspension, and Silverman has failed to come forward with sufficient evidence to permit a reasonable jury to conclude that the proffered reason—namely, the Springer incident—was a pretext for discrimination. To defeat the defendants' motion for summary judgment in the face of the defendants' proffered reason, Silverman must raise a genuine issue of material fact either as to (i) whether his suspension was more likely motivated by a discriminatory reason, or (ii) whether the proffered reason for the suspension was false. *Ebanks v. St. Christopher–Ottilie*, No. 98–CV–4777, 2000 WL 1364357, at *5 (E.D.N.Y. Sept.5, 2000); *see also Chambers*, 43 F.3d at 38. Silverman has failed to demonstrate either. Indeed, the defendants' testimony in this case repeatedly demonstrates that the decision to suspend Silverman was based on the Springer incident. (*See, e.g.,* Ferrigno Dep. at 14 ("Q: That memorandum says that you informed Mr. Silverman on July 17th that he was suspended without pay for what he allegedly did to Tiffany Springer? A: I served him actually with a notice. There was actually a notice of suspension without pay effective immediately. Q: That was based on what Tiffany Springer had said? A: The basis at the time was the result of allegations of sexual misconduct, is what I

wrote."); *id.* at 69–70 ("Q: Were you prepared to take disciplinary action against Mr. Silverman based on the alleged inappropriate contact that he had with other women, other than Springer? A: I don't believe so. Q: It was just the Springer incident? A: To the best of my recollection, yes."); Ghaly Dep. at 24–25 ("Q: [The suspension] was just based on the Tiffany Springer incident? A: Well, we never charged Mr. Silverman. Q: I know that. In terms of the suspension and investigation, was that about the Tiffany Springer incident? A: The investigation was precipitated by Ms. Springer's allegations."); Kaplan Dep. at 76 ("Q: What investigation was conducted before Mr. Silverman was suspended? A: We received the [Springer] complaint. Based on the nature of the complaint, based on information that we received from the division, the agency elected to suspend Mr. Silverman just purely based on the nature of the allegation and whatever backup they had at the time.").) Silverman has simply failed to come forward with evidence from which a reasonable jury could conclude that this reason was false. Additionally, the evidence to which Silverman points—the "more favorable" treatment of Lawrence and Kaplan's statement that "it was time for [Silverman] to retire"—does nothing more than create a "weak issue of fact as to whether the employer's reason was untrue"; in the face of "abundant and uncontroverted independent evidence that no discrimination had occurred," judgment as a matter of law in favor of the defendants in these circumstances is warranted. *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097.

For all these reasons, summary judgment is granted in favor of Roberts, Ghaly, Kaplan, and Ferrigno on Silverman's first two claims. Because Silverman also seeks to hold the City of New York liable in these claims as a result of the actions of

these defendants, the claims are dismissed as against the City, as well.

### III. *The § 1983 Conspiracy Claim Must Be Dismissed*

■ Silverman next alleges that the individual defendants engaged in a conspiracy to deprive him of his constitutional rights. The individual defendants argue that Silverman has failed to uncover any evidence of an agreement between them to deprive Silverman of his rights, a prerequisite to liability for a conspiracy. (*See* Def.Mem. at 23–26.) The defendants are correct.

At the outset, the Court notes that when Silverman originally sought leave to amend his complaint to add this claim, the Court denied the request, because the claim was futile. *See Silverman v. City of N.Y.,* No. 98–CV–6277, 2001 WL 218943, at *6–7 (E.D.N.Y. Feb.2, 2001). Silverman then moved for leave yet again, and once more sought to add this conspiracy claim. The defendants, however, did not oppose Silverman's request to allege this claim the second time around, and, accordingly, the Court granted Silverman leave to add the claim. *See Silverman v. City of N.Y.,* No. 98–CV–6277, 2001 WL 1776157, at *2 n. 1 (E.D.N.Y. Nov.19, 2001). Had the defendants simply opposed Silverman's request on the grounds they articulated in opposition to the first motion for leave to amend, no one—including the Court—would have been required to address the merits of this claim.

■ Nevertheless, the claim is now before the Court, and the Court's original ruling regarding the futility of this claim has come to fruition. Silverman has failed to adduce any evidence indicating that the defendants had an agreement to "rid themselves" of Silverman because of his age, race and religion. The Court holds the same opinion of this claim now as it did when Silverman first sought leave to add the claim in February of 2001:

> The ... Second Amended Complaint ... alleges that defendants engaged in "a conspiracy designed to deprive plaintiff of his constitutional and federal rights" and that they "were motivated by class-based animus and had an independent personal stake in achieving the objectives of the City of New York and HPD." (Sec.Am.Compl.¶ 88.) In order to make out a conspiracy claim based on § 1983 ..., a plaintiff must allege facts sufficient to show the existence of [a] conspiracy designed to deprive him of his rights. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir. 1977) (*per curiam*); *Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998), *aff'd in part by, vacated in part in, remanded in part by,* 205 F.3d 1324 (2d Cir.2000). As in *Shabazz,* plaintiff here "has not included any allegations or competent evidence to show that 'defendants "acted in a willful manner, culminating in an agreement, understanding or 'meeting of the minds,' that violated [his] rights, privileges, or immunities secured by the Constitution or federal courts."'" *Shabazz,* 994 F.Supp. at 467 (internal quotations omitted).

Plaintiff asserts that defendants Roberts, Kaplan, Ferrigno and Ghaly (high-ranking HPD officials) "acted in concert with each other" by forcing plaintiff to resign without a hearing and by publishing false statements about him in the course of the sexual harassment investigation. Moreover, he claims that defendants Navarro, Lawrence, Khaaliq and Arnold (plaintiff's co-workers HPD) conspired against him by taking the opportunity presented by the Springer incident to bring plaintiff down because they all "operated with the same motives and tactic," namely a "discriminatory an-

imus toward the white, Jewish elderly plaintiff." (Pl.'s Reply Mem. 3, 4) Other than offering conclusory allegations regarding defendants' motives and beliefs, plaintiff provides no facts to support his contentions or even inferences suggesting that such an allegation might be well-founded.

As far as the high-ranking HPD officials named in the complaint, the fact that they conducted a joint investigation of the alleged incident of sexual harassment is insufficient to convert defendants' actions into the requisite showing for a conspiracy, that is "a meeting of the minds ... on a course of action intended to deprive plaintiff of [his] constitutional rights." *Hickey–McAllister v. British Airways,* 978 F.Supp. 133, 138–39 (E.D.N.Y.1997). Nor does plaintiff allege facts showing that his co-workers had an agreement to deprive him of his rights. If anything, the fact that plaintiff loaned money to many of them would have likely endeared them to him rather than cause them to conspire against him. "Claims of conspiracy that are vague and provide no basis in fact must be dismissed." *Shabazz,* 994 F.Supp. at 467 (citing *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir.1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (citations omitted), *cert. denied,* 499 U.S. 937, 111 S.Ct. 1389, 113 L.Ed.2d 446 (1991)); *see also Boddie,* 105 F.3d at 862 (an "unsupported, speculative, and conclusory" claim of conspiracy may be dismissed on the pleadings). As such, plaintiff should not be permitted to assert the conspiracy claims based on § 1983....

*Silverman v. City of N.Y.,* No. 98–CV– 6277, 2001 WL 218943, at *6–7 (E.D.N.Y. Feb.2, 2001). As the same shortcomings evident in February of 2001 are manifest today, Silverman's § 1983 conspiracy claim is dismissed.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted, and the complaint dismissed.

SO ORDERED.