Nadine **ASPILAIRE**, Plaintiff,

v.

**WYETH PHARMACEUTICALS, INC.,** Defendants.

No. 07 Civ. 0952 (WCC).

United States District Court, S.D. New York.

March 30, 2009.

Steven A. Morelli, Esq., of Counsel, The Law Offices of Steven A. Morelli, Carle Place, NY, for Plaintiff.

Michael Delikat, Esq., James H. Mcquade, Esq., Mayotta H. Anderson, Esq., of Counsel, Orrick, Herrington & Sutcliffe LLP, New York, NY, for Defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Nadine Aspilaire brings this action pursuant to 42 U.S.C. § 1981 and the New York State Human Rights Law § 296 against defendant Wyeth Pharmaceuticals, Inc. ("Wyeth" or "defendant"). Plaintiff alleges that she suffered adverse action, an atmosphere of adverse acts, denial of promotion and denial of salary increases due to unlawful discrimination based on her race as well as retaliation for making complaints of such treatment. Defendant now moves for summary judgment. For the reasons set forth below, defendant's motion is granted in its entirety.

### BACKGROUND

Unless otherwise indicated, the following facts are undisputed. Wyeth is a company engaged in the development and manufacture of pharmaceutical, consumer healthcare and animal health products. (Def. R. 56.1 Stmt. ¶ 1.) Wyeth operates a pharmaceutical manufacturing facility in Pearl River, New York. (*Id.*) There are three shifts at the Pearl River facility: the first shift, 7:00 a.m. to 3:30 p.m.; the second shift, 3:00 p.m. to 11:30 p.m.; and the third shift, 11:00 p.m. to 7:30 a.m. (*Id.* ¶ 2.) Among the employees at Wyeth are biological operators and lead biological operators, who work directly on manufacturing lines; they are union employees whose employment is governed by the terms of a union contract between Wyeth and the International Chemical Workers Union Local 143c (the "Union Contract"). (*Id.* ¶¶ 3–4.)

Plaintiff is a Haitian–American female with an Associate degree in Mathematics and Science and a Bachelor degree in Organizational Management. (Complt. ¶¶ 8–9.) Plaintiff began her employment at Wyeth in January 2000 as a packaging operator on the second shift in Depart-

ment 735. (Def. R. 56.1 Stmt. ¶ 6.) Plaintiff was a union employee and understood that the terms of her employment at Wyeth were governed by the Union Contract. (*Id.* ¶ 5.) Plaintiff makes no allegation of race discrimination based on her employment as a packaging operator from January 2000 to December 2000. (*Id.* ¶ 7.)

## I. *Plaintiff's Claim That She Should Have Received the Maximum Pay Rate From December 2000 to November 2002*

As set forth in the Union Contract, each union job is divided into "labor grades" with three categories of pay rates, (1) a starting pay rate; (2) a 6–8 week pay rate; and (3) a maximum pay rate (the "Maximum Pay Rate"), within each labor grade. (*Id.* ¶¶ 8–9.) The pay rate categories apply to all union employees. (*Id.* ¶ 12.) For an operator or lead operator to receive the Maximum Pay Rate, he or she must complete required skill blocks; completing skill blocks requires undergoing training followed by a performance evaluation by a Wyeth trainer. (*Id.* ¶ 11.)

On October 17, 2000, plaintiff applied for a position as a lead biological operator in Department 421 on the second shift and in December 2000, David Coen[1] hired plaintiff for that position. (Def. R. 56.1 Stmt. ¶¶ 13–14.) This position was a promotion, as it increased plaintiffs labor grade from "7" to "9" and increased her pay rate to $16.19 per hour, which was the 6–8 week pay rate for that labor grade. (*Id.* ¶¶ 14–15.) At the time that she was promoted from packaging operator to lead biological operator, plaintiff had not taken any courses or received any training related to the new position. (*Id.* ¶ 16.) From January 16, 2001 to May 26, 2001, plaintiff took maternity leave. (*Id.* ¶ 17; Pl. R. 56.1 Counterstmt. ¶ 17.)

On January 16, 2002, plaintiff's labor grade was increased from "9" to "10" and she received an increase in her pay rate to $17.64 per hour, the 6–8 week pay rate for that labor grade. (Def. R. 56.1 Stmt. ¶ 18.) In November 2002, plaintiff completed the skill block requirements for the biological operator position, at which point she received the Maximum Pay Rate, $18.05 per hour. (*Id.* ¶ 19.) Plaintiff continued to earn the Maximum Pay Rate until she resigned from Wyeth in 2005. (*Id.* ¶ 21.)

Plaintiff's claim that she did not receive the Maximum Pay Rate is limited to the time period between December 2000 through November 2002. (*Id.* ¶ 22.) Plaintiff states that she spoke to Jeff Gathers, the Union Vice President, regarding the fact that, as of January 2001, she was not receiving the Maximum Pay Rate. (*Id.* ¶ 23.) Gathers responded that plaintiff was not receiving the Maximum Pay Rate because she had not completed all of the required skill blocks for the position of lead biological operator. (*Id.*) Plaintiff asked Gathers if she could be reimbursed[2] at the Maximum Pay Rate for the time it took to complete the training and plaintiff states that Gathers told her that he would try to get such a reimbursement for her. (Pl. R. 56.1 Counterstmt. ¶ 23.) Plaintiff never received a reimbursement. (*Id.*) Plaintiff further states that a white employee, Damian Corvacse, told her that he was given a reimbursement. (*Id.* ¶ 23.3.)

Plaintiff claims that James Mihalis and Lissy Saju, lead biological operators in

---

1. The evidence before this Court refers to a "Dave Cohn" (Pl. R. 56.1 Counterstmt. ¶ 23.1), a "David Coen" (Def. R. 56.1 Stmt. ¶¶ 14, 27) and a "Cohen" (Pl. R. 56.1 Counterstmt. ¶ 35). It appears from the record that all of these variants refer to the same person.

2. The Court assumes that by "reimbursed," plaintiff means that she sought to receive retroactive payment at the Maximum Pay Rate.

Department 421 during plaintiff's employment at Wyeth, told her that they received the Maximum Pay Rate without completing the requisite skill blocks and that Gathers stated the same with respect to Mihalis. (Def. R. 56.1 Stmt. ¶ 24; Pl. R. 56.1 Counterstmt. ¶¶ 24–26.) Defendant counters that it did not pay Mihalis at the Maximum Pay Rate until he had completed the requisite skill blocks. (Def. R. 56.1 Stmt. ¶ 25.) With respect to Saju, although defendant has been unable to locate records relating to the skill blocks that Saju completed, defendant contends that "[i]n the event that Saju did not complete all of the skill blocks for the lead biological operator position [prior to being paid at the Maximum Pay Rate], an oversight or error may have been made by Wyeth." (Def. R. 56.1 Stmt. ¶ 26.)

## II. Plaintiff's Claims Based on Assignment to Work Double Shifts and Reassignment to the Second Shift

In October 2001, plaintiff applied for a position as a lead biological operator on the third shift and was hired for that position. (Id. ¶ 27.) Plaintiff contends that her bid was "forced" and that she had "to work the [third] shift because [d]efendant needed more workers on the [third] shift and [p]laintiff had low seniority." (Pl. R. 56.1 Counterstmt. ¶ 27.) In March 2002, plaintiff applied for a position as a lead biological operator in Department 421 on the first shift and in or about April 2002, David Coen hired plaintiff for that position. (Def. R. 56.1 Stmt. ¶ 28.)

Plaintiff contends that, after she was moved to the first shift, she was forced to work on the second shift as well, thereby working 16 hours per day on Mondays, Tuesdays, Thursdays and Fridays from April 2002 to June 2002. (Id. ¶ 29.) Plaintiff states that she had suggested assigning two junior workers to come in early for their third shift, thereby relieving her from the second shift earlier in the day, so that she could care for her newborn child. (Pl R. 56.1 Counterstmt. ¶¶ 29–33.) Plaintiff states that her request was refused, though she later learned of Wyeth forcing other workers to begin work before their shift started. (Id.)

Wyeth operators and lead operators are frequently asked to work double shifts, for example during times in which production demands increase or there is a shortage of trained operators. (Def. R. 56.1 Stmt. ¶ 30.) Plaintiff states that she was forced to work double shifts because "[t]hey were short a lead [operator]." (Id. ¶ 32 (citing Aspilaire Dep. at 140).) Plaintiff states that employees of all races were required to work 16-hour days. (Def. R. 56.1 Stmt. ¶ 31 (citing Aspilaire Dep. at 279).)

Sometime in June 2002, approximately two months after plaintiff moved to the first shift, she was forced to move to the second shift. (Def. R. 56.1 Stmt. ¶ 33.) Operators and lead operators are sometimes forced to work shifts to which they are not regularly scheduled, based on seniority and need. (Id. ¶ 34.)

## III. Plaintiffs Claim Based on Assignment to Work as an Operator in the Inspection Area in Spite of Her Title as Lead Operator

Delores Perry was responsible for preparing the work schedules of the employees in Department 421. (Id. ¶ 35.)[3]

---

**3.** Plaintiff states that department heads Georgia Sloboda and Coen were responsible for making the schedule because they made all decisions for the department, however, the portion of the record to which plaintiff cites does not support this assertion. (Pl. R. 56.1

Counterstmt. ¶ 35 (citing Aspilaire Dep. at 146–47,

Q. Who is Dolores Perry?
A. Dolores Perry is the secretary ... she does the schedule, she puts it out.

Perry made the schedule based on manufacturing needs and employee qualifications and would sometimes have lead operators work as operators. (*Id.* ¶¶ 35–36.) Plaintiff, a lead operator, states that, at times, she was assigned to fill in as an operator[4] even though all other operators had not first been utilized. Plaintiff contends that this was a violation of the Union Contract, however, she does not cite any provision of the Union Contract that supports this proposition. (Pl. R. 56.1 Counterstmt. ¶ 36 (citing Aspilaire Aff. ¶ 19).) Plaintiff also states that white lead operators did not fill in as operators when the need arose, however, her affidavit does not support this assertion. (*Id.*, Aspilaire Aff. ¶ 20 "[O]ther white lead operators were required to work as operators....") Due to need, at times, plaintiff was scheduled to work as an operator in the inspection area. (Def. R. 56.1 Stmt. ¶ 37.)

As a lead operator, plaintiff was responsible for performing "all duties" of an operator and, in addition, overseeing operators and reviewing their paperwork submissions. (*Id.* ¶¶ 38–39; Pl. R. 56.1 Counterstmt. ¶ 39.) Plaintiff states that it was "common" for lead operators to work as operators, particularly during times in which there was a shortage of operators. (Def. R. 56.1 Stmt. ¶ 40 (citing Aspilaire Dep. at 145).) However, plaintiff states that she was kept in the position of operator after there was no longer a shortage of operators and that she was not permitted to rotate. (Pl. R. 56.1 Counterstmt. ¶¶ 40–41.)

Plaintiff claims that she was frequently scheduled to work as an operator in the inspection area. (Def. R. 56.1 Stmt. ¶ 42.) Documents reflecting the schedules from July 26, 2004 through February 17, 2005 indicate that a number of lead operators who were required to work in the inspection area as operators were white, including Merrill McIntyre, Damian Corvacse and Marie Novellino. (*Id.* ¶ 43.) Plaintiff states, however, that these white employees resumed their lead positions and rotated into different areas, but that plaintiff did not. (Pl. R. 56.1 Counterstmt. ¶ 43 (citing Aspilaire Aff. ¶ 20).) The schedules also reflect that many of the individuals who were scheduled to work as lead biological operators during that time were African Americans, including Yvonne DeCosta, Columbus Tyson and Geneva Berry. (Def. R. 56.1 Stmt. ¶ 44.)

At some point in early 2004, plaintiff was assigned to work in the syringe area where she was awaiting training. (*Id.* ¶ 45; Pl. R. 56.1 Counterstmt. ¶ 45.) After she began working there, she was told that the syringe area was neither busy nor fully operational and was sent back to work in the inspection area "where she did not act in her current capacity as lead biological operator." (Pl. R. 56.1 Counterstmt. ¶ 45; Def. R. 56.1 Stmt. ¶ 45.) Plaintiff contends that she was replaced in the syringe area by Moe Dika, over whom plaintiff had

---

Q. Do you know who makes the decisions on who works where on what days?
A. I don't know exactly that. I just know that [Sloboda and Coen] are the department heads, they are the ones that make the decisions for the department.
Q. You don't know who actually makes the day-to-day decisions on scheduling, is that what you're saying?
A. I don't know exactly. I know Dolores [Perry] puts out the schedule. I don't know if she makes out the schedule and says Dave [Coen], this is the schedule, and confirms with the department heads and puts it out.).)

4. Though neither party specifically addresses this issue, it appears from the record that plaintiff continued to be paid as a lead operator during the times in which she was filling in as an operator. (*See* Aspilaire Dep. at 182.)

seniority, and that white lead operators, "including Damian, Fi Fi, Lisa, and Cindy," were permitted to train in the syringe area.[5] (Pl. R. 56.1 Counterstmt. ¶ 45 (citing Aspilaire Dep. 231).) Plaintiff states that she complained to a supervisor about being removed from the syringe area and that the supervisor told her that she would receive her training in syringe eventually. (*Id.* ¶ 45.) Plaintiff states that she was never transferred back to syringe. (*Id.*)

## IV. *Plaintiffs Claim Based on Not Being Hired for the Administrative Assistant Position*

In or around September 2004, Brian Uram interviewed approximately twenty applicants for identical administrative assistant positions, also known as document specialist positions, on each of the three shifts. (Def. R. 56.1 Stmt. ¶¶ 47, 49.) The administrative assistants would report to Uram and be responsible for supporting the vial-filling operations, including reviewing and ensuring the timely completion of batch records and other documents and delivering these documents to Wyeth's Quality Assurance area for review. (*Id.* ¶¶ 47–48.) The majority of those who applied sought the first shift. (*Id.* ¶ 50.) In September 2004, plaintiff submitted an application for the administrative assistant position on the first shift only, however, she now states that the application may have also covered the second shift, though the application document did not explicitly reflect this. (*Id.* ¶¶ 52–53; Aspilaire Dep. 192–93, 207.) Plaintiff did not place a bid for the third shift. (*Id.*) Uram interviewed plaintiff for the administrative assistant

position on the first shift. (Def. R. 56.1 Stmt. ¶ 54.)

Uram hired Susan Price for the administrative position on the first shift. (*Id.* ¶ 55.) Price had worked in "batch records" and as a document specialist in Wyeth's Quality Assurance area. (*Id.* ¶ 56.) While in the Quality Assurance area, Price's function was to support Department 421's operations. (*Id.* ¶ 57.) In batch records, Price was responsible for filling, assembling and producing bulk batch records. (*Id.* ¶ 59.) As a document specialist, Price's duties included maintaining the document tracking system and issuing and distributing official copies of Wyeth's standard operating procedures. (*Id.* ¶ 58.) Prior to joining Wyeth, Price had ten years of experience as an office manager and seven years of experience as an administrative assistant, during which time her duties included generating productivity and sales activity reports, preparing payroll data, managing desk clerks, maintaining a database of information, inputting data and generating and distributing database reports. (*Id.* ¶ 60.)

Uram stated that he felt that Price was the most qualified applicant for the position due to her work experience in the Quality Assurance area at Wyeth, where she issued batch records and their supporting documents. (*Id.* ¶ 61.) Uram stated that Price was more qualified than plaintiff, whose experience at Wyeth was "working on the production floor." (*Id.*; Uram Decl. ¶ 8.) Plaintiff states that, at the time, Uram said that "there was a light shining on [plaintiff], which she interpreted to mean that her interview went very well, and that she was the best candidate

---

**5.** Defendant avers that plaintiffs statement regarding the schedules of Dika and Fi Fi should be disregarded because it conflicts with the work schedules produced by plaintiff. (Def. R. 56.1 Counterstmt. ¶ 45.) The

Court notes, however, that the schedules provided cover July 2004 through February 2005 and, thus, do not contradict plaintiff's statement regarding work assignments in early 2004. (*Id.* ¶ 45.)

for the position." (Pl. R. 56.1 Counterstmt. 61.)

In addition to reviewing applicants' resumes and experience, Uram consulted with Sloboda, a co-head of plaintiff's department, about various candidates for the administrative assistant position. (Def. R. 56.1 Stmt. ¶ 62.) Sloboda gave Uram positive feedback regarding Price, stating that Price was dependable and reliable. (*Id.*) Sloboda said that plaintiff had issues in the past with attendance and tardiness. (*Id.*) Uram was particularly concerned about these issues because on-time arrival was an important part of the administrative assistant position. (*Id.* ¶ 63.) Defendant points to five memos from various supervisors between November 2001 and March 2004 that note plaintiff's tardiness or absences and recommend that she improve in those areas. (*Id.* ¶ 64.) Plaintiff contends that she does not recall some of the memos and that one was unwarranted. (Pl. R. 56.1 Counterstmt. ¶ 64.) However, in her deposition, plaintiff did admit that she had some issues with tardiness in the past. (Aspilaire Dep. 151, "I think I was just coming in late.") Plaintiff admits that she does not believe that the memos were discriminatory or retaliatory or resulted in any adverse employment action. (Aspilaire Dep. 247–49.)

Uram hired Gladys Staniszewski for the administrative assistant position on the second shift. (Def. R. 56.1 Stmt. ¶ 66.) Before joining Wyeth, Staniszewski was an administrative assistant for two years, during which time her duties included record retention, data entry and tracking and updating the status of client orders. (*Id.*) Uram felt that she was the most qualified applicant for the position given her background. (*Id.*) Uram hired Louvenia Alford, an African–American woman, for the administrative position on the third shift. (*Id.* ¶ 67.)

## V. *Plaintiffs Selection to Work on the Flex Team*

In the summer of 2004, Wyeth assembled a team of employees, including operators, supervisors, managers and human resources representatives (the "Flex Team"), to examine operations at the Pearl River facility for the purpose of increasing production efficiency, improving employee morale and promoting communication between union employees and their supervisors. (*Id.* ¶¶ 69–70.) Sloboda selected plaintiff to join the Flex Team. (*Id.* ¶ 71.) Plaintiff stated that she had "mixed feelings," in that she was "not getting paid to do this extra work," but also that it was "an opportunity that [she] gained experience for [herself]," that it was a positive experience and that it was something that might help to get her promoted. (Aspilaire Dep. at 174–75, 178.)

As a member of the Flex Team, one of plaintiffs roles was to talk to union employees, learn what their complaints and concerns were and bring those complaints and concerns to the attention of management. (Def. R. 56.1 Stmt. ¶ 73.) Plaintiff compiled a list of complaints from approximately 100 employees, including employees in Department 421. (*Id.* ¶¶ 74–75.) The list included complaints regarding scheduling, rotation of work assignments and being forced to work double shifts that totaled 16 hours in one day. (*Id.*) Defendant points to an inconsistency in plaintiff's deposition testimony, wherein she first states that she did not receive any such complaints from white employees, but later states that it would be fair to say that the complaints were made by employees of all races. (*Compare* Aspilaire Dep. at 182 *with* Aspilaire Dep. at 186.)

Christine Wilkinson, a human resources representative and a member of the Flex Team, held meetings in November 2004 with approximately 150 employees of all

races and national origins, many of whom had multiple complaints, including complaints regarding overtime. (Def. R. 56.1 Stmt. ¶ 76.) Plaintiff states that morale was low among all employees in Department 421, with many employees complaining of forced overtime and work assignments, and plaintiff noted that people of all races were forced to work double shifts. (*Id.* ¶¶ 77–78; Pl. R. 56.1 Counterstmt. ¶ 77.)

In or about the summer or fall of 2004, plaintiff, along with a group of colleagues, met with Wilkinson and complained that they were frequently being scheduled to work in the inspection area. (Def. R. 56.1 Stmt. ¶ 79.) At her deposition, plaintiff stated that she thought that the group was comprised exclusively of African–American employees, but conceded that one employee present may not have been African American. (Aspilaire Dep. at 64.) In her affidavit, plaintiff stated that, during the meeting, she said that "blacks were being treated differently and unfairly and that [they] were being targeted." (Aspilaire Aff. ¶ 30.) However, during plaintiff's deposition, when asked whether, during the meeting, she said that she was being treated unfairly because she was black, plaintiff responded that "[she doesn't] remember if [she] said that or not" and that she was not sure if anybody else at the meeting said that. (Aspilaire Dep. at 66–67.) Regarding that same meeting, Wilkinson states that "[n]either [plaintiff], nor any of her colleagues, stated or suggested in any way that they felt that they were being treated unfairly because of their race." (Wilkinson Decl. ¶ 7.)

## VI. *Plaintiffs Resignation From Wyeth*

In or about October 2004, plaintiff applied for a position as a packaging supervisor at Par Pharmaceuticals ("Par") and, by letter dated March 14, 2005, plaintiff advised Coen and Sloboda that she had accepted a job with another company and

intended to leave Wyeth in two weeks. (Def. R. 56.1 Stmt. ¶¶ 83–84.)

Plaintiff resigned from Wyeth because she had received a better job opportunity from Par and because she felt that working conditions at Wyeth had become intolerable due to the scheduling of her shifts and because she was asked to perform the job duties of an operator rather than those of a lead operator. (Def. R. 56.1 Stmt. ¶¶ 86–87.) In plaintiff's affidavit, she stated that she left in part because she was a target due to her race and all the complaints that she had made. (Aspilaire Aff. 136.)

## VII. *Wyeth Harassment Policies and Practices*

Wyeth had a written policy against unlawful discrimination at all times relevant to this case. (Def. R. 56.1 Stmt. ¶ 88.) Wyeth's policy against unlawful discrimination was included in Wyeth's Code of Conduct and the policy is posted in memoranda on bulletin boards at entrances and exits of the Pearl River plant and at designated buildings throughout the site. (*Id.* ¶¶ 93–94.) Under the policy in place from July 1, 2001 to June 30, 2002, which was substantially similar to the policy in place from 2002 to present, Wyeth employees were strongly encouraged to promptly report all incidents of discrimination or inappropriate workplace behavior to any manager or human resources representative, employees could also discuss their concerns with any regional human resources representative or contact Wyeth's human resources help line. (*Id.* ¶¶ 90, 92.)

The Union Contract outlined a formal, written grievance procedure for employees and also stated that an employee had the right to have a grievance adjusted without the intervention of a union representative. (*Id.* ¶¶ 96–97.) Plaintiff understood that she had the right to file complaints and

grievances with the Union while at Wyeth. (Aspilaire Dep. at 47.) Plaintiff never filed a formal grievance with the Union during her employment at Wyeth. (Def. R. 56.1 Stmt. ¶¶ 99–100.)

## DISCUSSION

### I. *Legal Standard*

Summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, as one court explained:

> [S]ummary judgment must be granted against a party in instances when such party fails to adequately establish an essential element on which it bears the burden of proof.... The non-moving party may not rest upon unsubstantiated allegations, conclusory assertions or mere denials of the adverse party's pleading, but must set forth and establish specific facts showing that there is a genuine issue for trial.... A metaphysical or other whimsical doubt concerning a material fact does not establish a genuine issue necessitating a trial.... The mere existence of a scintilla of evidence supporting the non-movant's case is insufficient to defeat a motion for summary judgment.

*Brooks v. DiFasi*, 1997 WL 436750, at \*2, 1997 U.S. Dist. LEXIS 11162, at \*6–7 (W.D.N.Y. July 30, 1997) (internal quotation marks and citations omitted).

### II. *Timeliness of the Claims*

■ The statute of limitations on claims brought pursuant to New York Human Rights Law is three years and the statute of limitations on federal claims brought under Section 1981 is four years. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (citing 28 U.S.C. § 1658); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998). Plaintiff filed her Complaint on January 12, 2007. The following claims of discrimination and/or retaliation arise from events that took place prior to January 12, 2003: (1) plaintiff's claim that she should have received the Maximum Pay Rate from December 2000 to November 2002; (2) plaintiff's claim that she was forced to work overtime from April 2002 to June 2002; and (3) plaintiff's claim that she was forced to work on the second shift in June 2002. Defendant contends that each claim of discrimination or retaliation that is based on those events should be dismissed as time barred. Plaintiff contends that all claims should be considered timely under the continuing violation doctrine.

■ Under the continuing violation doctrine, a plaintiff may bring suit based on

conduct that occurred outside of the statute of limitations period, provided that the conduct is a result of specific discriminatory policies or practices. *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). The policy need not be "formal" or "widespread," but the employer must permit the conduct "to continue unremedied for so long that its inaction may reasonably be viewed as tantamount to a policy or practice of tolerating such discrimination." *Fitzgerald v. Henderson,* 251 F.3d 345, 362 (2d Cir.2001).

 In 2002, the Supreme Court clarified that the continuing violation doctrine will not apply to "discrete acts of discrimination or retaliation that occur outside the statutory time period," explaining that discrete acts will not converge into "a single unlawful practice for the purposes of timely filing." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 111–12, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In the instant case, plaintiffs allegations that she was not paid at the maximum rate and that she was forced to work overtime and double shifts all occurred prior to the statutory period. Each incident was separate and discrete and not alleged to bear any relation to plaintiffs timely claims. Therefore, the separate and discrete acts of discrimination and retaliation alleged to have occurred prior to January 2003, specifically, plaintiff's allegation of discriminatory scheduling, fall outside the scope of the continuing violation doctrine as set forth in *Morgan. See Henry v. Wyeth Pharms., Inc.,* 2007 WL 2230096, at *28 (S.D.N.Y. July 30, 2007) ("[I]n the wake of *Morgan,* the continuing violation doctrine no longer applies to discrete discriminatory acts."). Accordingly, each of plaintiff's disparate treatment claims and retaliation claims based on conduct that occurred prior to January 2003 are time barred under the statute of limitations.

### III. *Disparate Treatment Claims*

 Employment discrimination claims brought under the New York Human Rights Law and under Section 1981 are evaluated under the same standards that apply to Title VII cases. *Schiano v. Quality Payroll Systems, Inc.,* 445 F.3d 597, 609 (2d Cir.2006); *Shider v. Commc'n Workers of Am.,* 2004 WL 613093, at *4 (S.D.N.Y. Mar. 29, 2004), *aff'd,* —— Fed. Appx. ——, 2005 WL 2650007 (2d Cir. Oct 17, 2005). Under the *McDonnell Douglas* burden-shifting framework set forth by the Supreme Court, a plaintiff who claims to have been subjected to race discrimination in violation of Title VII must first make a *prima facie* showing of racial discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff sets forth a *prima facie* case by establishing that: (1) she is a member of a protected class; (2) she is qualified for the position that she held or sought; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At the summary judgment stage under the *McDonnell Douglas* framework, plaintiff's burden on her *prima facie* case is *de minimus. Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988).

 If a plaintiff sets forth a *prima facie* case of discrimination, then a presumption of discrimination arises and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its actions. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *see also St. Mary's Honor Ctr.,* 509 U.S. at 506–07, 113 S.Ct. 2742. Defendant meets this burden by

introducing admissible evidence establishing a non-discriminatory rationale which, if believed by the trier of fact, would support the finding that race discrimination did not underlie the adverse employment act. *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Therefore, if the defendant carries its burden of production, then the presumption of discrimination raised by the plaintiff's *prima facie* case is rebutted and the plaintiff must establish, by a preponderance of the evidence, that the defendant's proffered, non-discriminatory rationale is merely a pretext for discrimination. *Id.*

While summary judgment must be granted with caution in employment discrimination actions, it "remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir.1994). Thus, "even in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) ("The party opposing summary judgment may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.").

### A. Plaintiff's Claim That She Should Have Received the Maximum Pay Rate From December 2000 to November 2002

As described in greater detail above, plaintiff's claim of discrimination based on the fact that she was not paid the Maximum Pay Rate from December 2000 to November 2002 is barred by the statute of limitations. Plaintiffs argument that the continuing violation doctrine applies is unavailing because the pay rate allegation is discrete and it concluded before the statutory period. *See Nat'l RR Passenger Corp.*, 536 U.S. at 105, 111–12, 122 S.Ct. 2061.

Even if timely, plaintiff's claim would still fail because plaintiff has not met her *prima facie* burden of establishing that the adverse employment action (*i.e.*, not being paid at the Maximum Pay Rate) gives rise to an inference of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742. It is undisputed that, as a prerequisite to receiving the Maximum Pay Rate, Wyeth employees must complete all skill blocks relevant to their position. (Rowan Decl. ¶¶ 6–7.) It is also undisputed that, prior to November 2002, plaintiff did not complete all of the required skill blocks for her position and that, upon completion of those skill blocks, she did receive the Maximum Pay Rate. (Aspilaire Dep. at 52–55.) Plaintiffs allegation that other people told her that white workers were receiving the Maximum Pay Rate without having completed the required skill blocks is the only evidence before this Court that could give rise to an inference of discrimination. (*Id.* at 95–97.) As the statements upon which plaintiff relies are not supported by any affiants with first-hand knowledge, such statements are hearsay and, thus, not proper for this Court to consider on a motion for summary judgment. *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir.1999) (a hearsay statement is not competent evidence and, thus, cannot be considered on a summary judgment motion).

Because plaintiff's claim of disparate treatment based on her not receiving the

Maximum Pay Rate from December 2000 to November 2002 fails to set forth a *prima facie* case of discrimination, plaintiff has failed to present evidence sufficient to withstand the instant motion for summary judgment.

### 1. *Plaintiffs Claim That She Should Have Been Reimbursed at the Maximum Pay Rate*

In what appears to be a subset of plaintiffs claim that she should have been paid at the Maximum Pay Rate from December 2000 to November 2002, plaintiff also claims that she should have been reimbursed at the Maximum Pay Rate following the completion of her required skill blocks and that defendant's failure to reimburse her at the Maximum Pay Rate was discriminatory. Plaintiff claims that the reimbursements should have been made in subsequent paychecks; because at least some of those paychecks were issued during the statutory period, this claim is timely.[6] However, it is still subject to dismissal.

Plaintiff's only argument in support of her allegation that defendant's failure to reimburse her at the Maximum Pay Rate

was discriminatory is that a Caucasian employee, Corvacse, told her that he had been reimbursed by defendant at the Maximum Pay Rate. (Aspilaire Dep. at 273.) This statement is hearsay and, therefore, inappropriate for this Court to consider on a motion for summary judgment. *See Woods v. Newburgh Enlarged City Sch. Dist.*, 288 Fed.Appx. 757, 758–59 (2d Cir. 2008); *and Sarno*, 183 F.3d at 160 (hearsay is not competent evidence and, thus, cannot be considered on a summary judgment motion). Plaintiff does not set forth any indication that defendant had a duty to reimburse her and neither does plaintiff offer any proof, apart from hearsay evidence, that defendant's failure to reimburse her gives rise to an inference of discrimination. Therefore, this claim cannot withstand the instant motion for summary judgment.

### B. *Plaintiffs Claims Based on Assignment to Work Double Shifts and Reassignment to the Second Shift*

As described in greater detail above, plaintiffs claims of discrimination based on

---

6. On January 29, 2009, President Obama signed into law the "Lilly Ledbetter Fair Pay Act of 2009" (the "Act"), Pub.L. No. 111–2, 123 Stat. 5 (amending 42 U.S.C. § 2000e–5(e)). Under the Act, "a discriminatory compensation decision ... occurs each time compensation is paid pursuant to the discriminatory compensation decision." The Act overturns the Supreme Court's 2007 holding in *Ledbetter v. Goodyear Tire & Rubber Company*, 550 U.S. 618, 127 S.Ct. 2162, 2174, 167 L.Ed.2d 982 (2007) (Where there is no evidence that the employer "initially adopted its [pay-rate system] in order to discriminate ... or that it later applied this system ... within the [statutory] period with any discriminatory animus," the mere fact that "this discrimination reduced the amount of later paychecks" does not mean that "each new paycheck constitutes a new violation."). As the Act was so recently enacted, little guidance has emerged on its application and outstanding questions remain as to its applicability to this case. The Act does not, by its terms, apply to cases brought under § 1981, as is this one. However, Title VII, to which the Act does expressly apply, and § 1981 cases are frequently analyzed under the same framework. Neither is it clear how expansive courts will be in their determination of when employees were affected by discriminatory compensation decisions. Undoubtedly, answers to these questions will soon emerge. However, we need not decide them on this motion; for purposes of this motion we accept that under the Act, plaintiff's claim that she should have been reimbursed at the Maximum Pay Rate is timely, because the decision not to pay plaintiff at the Maximum Pay Rate, which decision was made prior to the statutory period, affected the amount of plaintiff's paychecks during the statutory period.

the fact that, in 2002, she was assigned to work double shifts and was reassigned from shift 1 to shift 2 are barred by the statute of limitations. Plaintiff's argument that the continuing violation doctrine applies is unavailing because the shift assignments and reassignments are discrete and they concluded before the statutory period. *See Nat'l RR Passenger Corp.*, 536 U.S. at 105, 111–12, 122 S.Ct. 2061.

■ Even if these claims were timely, plaintiff's claims would fail because she has not shown an adverse employment act, as she must, in order to make a *prima facie* showing of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742. A materially adverse change in employment "include[s] discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir.1999). Assignment to a double shift and reassignment to a shift later in the day are mere "alteration[s] of job responsibilities" and insufficient to be considered a materially adverse employment action. *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.2000) (An adverse employment act "must be more disruptive than a mere inconvenience or an alteration of job responsibilities.") (internal quotation marks and citation omitted).

Moreover, even if shift assignments and reassignments were materially adverse employment acts, plaintiff would still be unable to meet her *prima facie* burden because there is no evidence in the record before the Court that gives rise to an inference of discrimination. Plaintiff herself admits that people of all races in Department 421 were forced to work double shifts (Aspilaire Dep. at 279) and it is undisputed that operators and lead operators were moved to different shifts based on manufacturing needs (Coen Decl. ¶ 2). No evidence before this Court indicates that any assignments or reassignments were based on race.

Because plaintiff's claims of disparate treatment based on her shift assignments and reassignments are barred by the statute of limitations and, in any event, because plaintiff fails to set forth a *prima facie* case of discrimination, the evidence presented is insufficient to overcome defendant's motion for summary judgment.

**C.** ***Plaintiffs Claim Based on Assignment to Work as an Operator in the Inspection Area in Spite of Her Title as Lead Operator***

Plaintiff alleges that her assignment to work as an operator in the inspection area on various occasions between July 2004 and February 2005 was discriminatory. As set forth above, the legal standard for a disparate treatment claim requires plaintiff to first set forth a *prima facie* case establishing that: (1) she is a member of a protected class; (2) she is qualified for the position that she held or sought; (3) she suffered an adverse employment action; and (4) the adverse employment action gave rise to an inference of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. 2742. A materially adverse change in employment "include[s] discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Morris*, 196 F.3d at 110. It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya*, 202 F.3d at 640 (internal quotation marks and citation omitted).

■ Plaintiff's assignment to work as an operator in the inspection area in spite of her title as "lead operator" fails to rise to the level of an adverse employment act. Plaintiff avers that this assignment was a "demo[tion]" (Pl. Mem. Opp. Summ. J. at 9), however, it is undisputed that the role of a lead operator includes all of the re-

sponsibilities of an operator and that lead operators were often assigned to work as operators in the inspection area, based on Wyeth's needs. (Pl. R. 56.1 Counterstmt. ¶ 39; Def. R. 56.1 Stmt. ¶ 39; Aspilaire Dep. at 161, "Q. Isn't it true that as a lead biological operator you and other lead biological operators did work on the inspection line, and that was part of your job? A. Yes.") Because being assigned to work as an operator in the inspection area is within the scope of the job of a lead operator and was consistent with the terms and conditions of plaintiffs employment, it did not affect "ultimate employment decisions such as promotion, wages, or termination," as it must, in order to be considered an adverse employment act. *Regis v. Metro. Jewish Geriatric Ctr.*, 2000 WL 264336, at *8 (E.D.N.Y. Jan. 11, 2000); *Katz v. Beth Israel Med. Ctr.*, 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001) ("receiving unfavorable schedules or work assignments ... do not rise to the level of adverse employment actions").

■ Plaintiff argues in the alternative that, if this Court finds that plaintiff has not suffered from any single action that independently constituted an adverse employment action, summary judgment should still be denied under the theory that defendant's actions, considered in the aggregate, created an atmosphere of adverse acts. The Second Circuit has held that "a combination of seemingly minor incidents" may form the basis for an adverse employment action once the incidents "reach a critical mass." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir.2002); *see also Wanamaker v. Columbian Rope Co.*, 108 F.3d 462 (2d Cir.1997); *Garvin v. Potter*, 367 F.Supp.2d 548, 571 (S.D.N.Y. 2005). The Court need reach neither the question of whether the "atmosphere of adverse acts" analysis applies to this case nor the question of whether plaintiffs assignment to work as an operator, when combined with the only timely adverse act

alleged (the denial of plaintiff's application to be an administrative assistant), reaches the level of a "critical mass." This is because, even if an aggregation of acts could render plaintiff's shift claim to be adverse, plaintiff still fails to set forth a *prima facie* case of discrimination because nothing in the record supports an inference of discrimination therefrom.

It is undisputed that, during the time period that gave rise to plaintiff's claim, a number of white lead operators were scheduled to work as operators, a number of African–American workers were scheduled to work as lead operators and employees of all races made complaints to Wyeth about scheduling. (Aspilaire Dep. at 186; Def. R. 56.1 ¶¶ 43–44; Pl. R. 56.1 Counterstmt. ¶¶ 43–44.) While plaintiff states in her affidavit that white workers were permitted to rotate out of the operator position while she was not permitted to do so, no other evidence on the record before this Court supports that allegation. (Aspilaire Aff. ¶ 20.) *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005) (To defeat a motion for summary judgment, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation.") (internal quotation marks and citation omitted).

Because plaintiff has not set forth a *prima facie* case of disparate treatment based on her assignment to work as an operator in the inspection area, she has failed to set forth sufficient evidence to overcome defendant's motion for summary judgment as to that claim.

### D. Plaintiff's Claim Based on Not Being Hired For the Administrative Assistant Position

Plaintiff alleges that Uram's decision not to hire her as an administrative assistant was discriminatory. Plaintiff avers that a white woman was promoted to the position

of administrative assistant, even though she "did not have the skills and training that plaintiff had." (Pl. Mem. Opp. Summ. J. at 12.)

As a preliminary matter, the Court addresses the question of which of the three administrative assistant positions plaintiff applied for. In or around September 2004, Uram sought applicants for three administrative assistants, one on each of the three shifts. It is undisputed that plaintiff submitted only one application form, that this form was written as an application for only the first shift and that plaintiff interviewed only for the position on the first shift. Plaintiff stated in her deposition, however, that she was "not 100 percent sure" as to whether the application form covered the second shift as well as the first. (Aspilaire Dep. at 209.) While plaintiff stated that submitting only one application and being selected for an interview for a position on the first shift "[did] not mean that [she] did not want to be considered for the second shift as well" (Pl. R. 56.1 Counterstmt. ¶ 54), an unexpressed desire to be considered for a position is not the equivalent of an application for a position. With respect to the position on the third shift, plaintiff stated in her deposition that she was "sure" that she did not apply for it. (Aspilaire Dep. at 210.) Moreover, plaintiff failed to respond to defendant's arguments in favor of summary judgment with respect to plaintiff's claims relating to the second and third shifts. (Pl. Mem. Opp. Summ. J. at 12–14.)

Based on plaintiff's failure to establish that she applied for any position other than the position on the first shift and the fact that plaintiff's response papers to the instant motion make no reference to the positions on the second or third shifts, to the extent that plaintiff does make a claim that Uram's decision not to hire her as an administrative assistant on the second or third shifts was discriminatory, that claim

is dismissed. The Court will consider only whether the decision not to hire plaintiff on the first shift was discriminatory.

■ The Court first notes that plaintiff has made allegations sufficient to set forth a *prima facie* case of discriminatory failure to promote based on the following factors: she is a member of a protected class; she was qualified for the position of administrative assistant on the first shift, which is evident based on the fact that Uram selected her from among a pool of applicants for an interview; her application was denied; and that denial occurred under circumstances that give rise to an inference of discrimination. *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000). At this initial stage, where plaintiffs burden of setting forth a *prima facie* case is *de minimus,* the mere fact that Wyeth hired a white employee who was at least arguably situated similarly to plaintiff (*i.e.,* both had some experience relevant to the administrative assistant position) and who was treated differently than plaintiff, as she was hired for the job whereas plaintiff was not, will suffice to give rise to an inference of discrimination. *See Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999) ("A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably.").

■ As plaintiff has set forth a *prima facie* case of discrimination, the burden of production shifts to defendant to set forth a legitimate, non-discriminatory reason for selecting Price, instead of plaintiff, for the administrative assistant position on the first shift. The position of administrative assistant involved supporting vial-filling operations, including reviewing and completing batch records for Wyeth's Quality Assurance area. Uram stated that he believed that Price was the most qualified

applicant for the job based on Price's experience, which included work at Wyeth in batch records and as a document specialist in the Quality Assurance area supporting Department 421's operations, as well as work as an office manager for several years prior to joining Wyeth. (Uram Decl. ¶ 7.) Uram's statements regarding Price's qualifications are supported by Price's resume. (Uram Decl., Ex. 1.) Uram states that Price's work experience better qualified her for the position than did plaintiff's experience "working on the production floor." (Uram Decl. ¶ 8.) In addition, Uram stated that he spoke with Sloboda regarding both Price and plaintiff and that Sloboda provided Uram with positive feedback regarding Price and told Uram that plaintiff had "attendance and tardiness issues in the past." (*Id.* ¶ 9.) Uram found Slobodans feedback regarding plaintiff to be particularly concerning because "it was important that the Administrative Assistants get to work on time so that they could pass off documents and verbally convey information to the Administrative Assistant working on the next shift." (*Id.* ¶ 10.) These are legitimate, non-discriminatory reasons for selecting Price instead of plaintiff for the administrative assistant position on the first shift.

As defendant has established a legitimate, non-discriminatory reason for hiring Price, the ultimate burden returns to plaintiff to prove that this reason was merely a pretext for discrimination. Plaintiff avers that defendant's reasons were pretextual because: (1) "Sloboda told [p]laintiff that [d]efendant was seeking someone in-house for the position or someone that was already trained in Department 421 [and that] Price, however, was not in-house and not trained in Department 421;" (2) "Uram himself admitted that [p]laintiff 'interviewed very well,' met all of the qualifications for the position and even told [p]laintiff that 'there was a light shining on her;'" and (3) plaintiff's attend-

ance and tardiness issues "consisted of 'reply memos' that [p]laintiff received and had no affect [sic] on [p]laintiff's record whatsoever ... [p]laintiff was never disciplined or written-up ... [and Uram] could not recall if" he made the ultimate hiring decision prior to his conversation with Sloboda, during which he learned of the " 'reply memos.' " (Pl. Mem. Opp. Summ. J. at 15.)

With respect to plaintiff's first argument, as a threshold matter, the statements alleged to have been made by Sloboda are hearsay and, therefore, not competent evidence for this Court to consider. Setting aside the issue of the competence of that evidence, however, plaintiff's allegation still fails to show that defendant's proffered reason was pretextual. Contrary to plaintiff's conclusory assertion in her response to the instant motion, all evidence before this Court indicates that Price was already employed by Wyeth at the time Uram hired her (therefore, she was "in-house") and had direct experience overseeing Department 421 from the Quality Assurance area. (Uram Decl. ¶ 7; Uram Decl., Ex. 1.)

Plaintiff next argues that Uram's alleged statement to plaintiff that she had interviewed very well and met all of the qualifications for the job renders his ultimate decision to hire Price pretextual. However, the fact that plaintiff may have interviewed well and been qualified for the job does not render pretextual the decision that Price was the better qualified of the two candidates.

Finally, plaintiff's assertions regarding her past problems with tardiness do not satisfy her ultimate burden to prove that defendant's proffered, non-discriminatory reason for hiring Price was pretextual. Plaintiff's allegation that Uram could not remember whether he learned of plaintiff's

tardiness problems prior to making the ultimate hiring decision does not prove pretext because, even without consideration of plaintiff's tardiness record, defendant has already established that Uram believed that Price's work experience was more relevant to the position than plaintiff's and constituted an independent and adequate basis for hiring Price. With respect to plaintiff's assertion that her past problems with tardiness had no effect on her employment record, the Court fails to see the relevance of this argument. It is undisputed that writeups were made by various supervisors concerning plaintiff's problems with tardiness and it is undisputed that, at some point, Uram learned of those issues. Whether they resulted in further discipline to plaintiff bears no relevance to the question of whether plaintiff's tardiness issues had a genuine impact on Uram's decision not to hire her.

Because plaintiff has set forth no evidence to support a finding that defendant's proffered, non-discriminatory reason for hiring Price was merely a pretext for racial discrimination, plaintiff cannot carry her ultimate burden. Plaintiff's claim of disparate treatment based on discriminatory failure to promote cannot withstand the instant motion for summary judgment.

### IV. *Retaliation Claim*

 Retaliation claims brought under Section 1981, like those brought under Title VII, are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See Cook v. CBS, Inc.,* 47 Fed.Appx. 594, 596 (2d Cir.2002); *Ofoedu v. St. Francis Hosp. & Med. Ctr.,* 2006 WL 2642415, at *22 (D.Conn. Sept. 13, 2006). To establish a *prima facie* case of retaliation, plaintiff must establish that: (1) she was engaged in a protected activity; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer. *Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 113 (2d Cir.2000).

 If the plaintiff sets out a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory rationale for its actions. *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). If the defendant proffers a legitimate, non-retaliatory reason, the burden of production then shifts back to the plaintiff to introduce evidence that the defendant's reason was a pretext for retaliation. *Id.* The burden of proof and persuasion remains at all times with the plaintiff. *Milano v. Astrue,* 2008 WL 4410131, at *27 (S.D.N.Y. Sept. 26, 2008).

The first element of the *prima facie* case requires a showing that plaintiff engaged in a "protected activity," which refers to actions taken to protest or oppose statutorily prohibited discrimination. *Bryant v. Verizon Commc'ns, Inc.,* 550 F.Supp.2d 513, 537–38 (S.D.N.Y.2008). As a public policy matter, speech protections are generally meant to encourage individuals to speak out in furtherance of a public interest without fear of retaliation. Therefore, mere complaints of unfair treatment by an individual are not protected speech because unfair treatment by an employer does not implicate a public interest concern. *Ezekwo v. N.Y. City Health & Hosps. Corp.,* 940 F.2d 775, 781 (2d Cir. 1991). However, complaints that the unfair treatment is based on race discrimination in violation of Title VII will render that speech protected from retaliation because race discrimination does implicate a public interest concern. *See Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.,* 136 F.3d 276, 291–92 (2d Cir.1998). The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class

and that he is not complaining merely of unfair treatment generally. *Dinice–Allen v. Yale–New Haven Hosp.*, 2008 WL 160206, at *4 (D.Conn. Jan. 10, 2008).

■ Although plaintiff alleges that she made numerous complaints to various colleagues and supervisors at Wyeth, only one of those complaints appears to have been related to statutorily prohibited discrimination.[7] While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity. *See Woods v. N.M.C. Labs.*, 1997 WL 1038873, at *2 (E.D.N.Y. July 14, 1997), *aff'd*, 162 F.3d 1149 (2d Cir. 1998).

■ The only complaint that may have implicated race, thereby giving rise to a protected activity, was allegedly made by plaintiff during her 2004 meeting with Wilkinson. (Aspilaire Dep. at 220.) Plaintiff testified that she, along with some other African–American employees and possibly an employee who was not African American, met with Wilkinson as a group to discuss the fact that they felt that they were being treated unfairly with respect to scheduling. (*Id.* at 64–66.) Plaintiff stated that the she and the other employees "[went] to her, because [they] felt [discriminated against]," however, plaintiff could not remember whether she specifically articulated a concern about race discrimination at the meeting. (*Id.* at 65.) Plaintiff "may have said … [she felt] like [she was] being treated unfairly because [she was] black but [she] *can't remember* specifically, [she] can't say." (*Id.* at 66 (emphasis added).) In plaintiff's affidavit, she states that she *"remember[s]* explaining to [Wilkinson] … that blacks were being treated differently and unfairly and that we were being targeted." (Aspilaire Aff. ¶ 30 (emphasis added).) Because this statement in the affidavit contradicts plaintiff's deposition testimony, it is improper for the Court to consider. *Mack v. U.S.*, 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."). Moreover, the prevarications in plaintiffs deposition testimony would render speculative any finding that she did specifically complain of race discrimination. Viewing the evidence in the light most favorable to plaintiff, she

---

7. In plaintiff's response papers to this motion, plaintiff states that she "specifically reported discriminatory practices when she complained to: (1) Rodriguez, Gathers, Cohen, and Spohn about not receiving the [M]aximum [P]ay [R]ate; (2) Gathers about not being reimbursed at the [M]aximum [P]ay [R]ate; (3) Cohen, Sloboda, Denise Papernick, plant manager, Gathers, McDermott and Wilkinson regarding her shifts, not being scheduled as a lead biological operator, and forced overtime; and, (4) Rodriguez about being removed from syringe and replaced to inspection." (Pl. Mem. Opp. Summ. J. at 16–17 (internal citations omitted).) Nothing in the record, however, reflects that plaintiff complained of race discrimination in any of these instances. Rather, plaintiff states that, regarding her pay rate, she *"felt* that they were treating [her] that way because [she

was] a black Haitian female" (Aspilaire Dep. at 102) (emphasis added) but, when she testified in her deposition about her complaints regarding her pay rate, plaintiff made no reference to race. (*Id.* at 94.) Plaintiff also states that she complained about being rescheduled in spite of her seniority, but her deposition testimony makes no reference to race in the context of those complaints. (*Id.* at 117–18.) Plaintiff notes that she complained about being scheduled to work as an operator, but her deposition testimony again makes no reference to race in connection with this complaint. (*Id.* at 182–83.) Moreover, when asked at her deposition for the basis of her belief that she was being retaliated against, plaintiff made no mention of the events listed above; rather, she referred only to the meeting with Wilkinson in 2004 regarding scheduling. (*Id.* at 220.)

cannot remember whether she engaged in a protected activity.

Plaintiff next argues that, "[e]ven if [p]laintiff and the group [of] employees did not specially [sic] state that they were being discriminated against because of their race, a reasonable person could have understood that the group, including [p]laintiff, was complaining of discrimination." (Pl. Mem. Opp. Summ. J. at 17.) At the outset, the Court notes that, contrary to plaintiff's assertion in her response papers to this motion that the group "consisted of all black employees" (*id.*), plaintiff stated during her deposition that the group may not have been comprised solely of African Americans. (Aspilaire Dep. at 64.) Moreover, even assuming that only African Americans met with Wilkinson to complain about scheduling and work assignments, the mere fact that the group making the complaints was African American will not convert an ordinary complaint into a complaint of racial discrimination sufficient to put the employer on notice of such discrimination, as is the purpose of the speech protections under Title VII. *Dinice–Allen*, 2008 WL 160206, at *4 (finding no complaint of racial discrimination where an employee, in her deposition, "conceded no recall of complaining ... of racial discrimination but alternatively noted being unsure of doing so,") and further noting that

> ([a]sserting a feeling of discrimination, without specification, would not constitute assertion of either race nor age discrimination specifically such that defendant would know the specific claim being made. The requirement of protected activity is intended to put the employer on notice of the specific conduct complained of so a reasonable opportunity to rectify the situation would be afforded, an opportunity which is not created by complaints which are ambiguous or non-specific).

Put simply, it is not the constitution of the complaining group that renders speech protected, but rather the articulated complaint itself. As no other evidence in the record supports a finding that plaintiff made any complaint of racial discrimination, plaintiff fails to set forth a *prima facie* case of retaliation for the exercise of protected speech.

Even if the complaints made during the meeting with Wilkinson did constitute protected speech, plaintiffs claim would still fail because she has not met her initial burden to make a *prima facie* case. Plaintiff lists a number of actions that she claims to have been adverse and retaliatory. (*See* Pl. Mem. Opp. Summ. J. at 19.) However, only two of those actions occurred after the Wilkinson meeting, thereby raising the possibility that they were retaliatory: (1) plaintiff's assignment to work as an operator in the inspection area; and (2) the denial of plaintiff's application to work as an administrative assistant.

Plaintiff's, avers that her assignment to work as an operator in the inspection area, in spite of her named position as lead operator, was retaliatory. The third prong of a *prima facie* case of retaliation requires a showing that the employer took adverse action against plaintiff. *Gordon*, 232 F.3d at 113. The Supreme Court has cautioned that the challenged action must have been "materially adverse," thereby distinguishing "significant" from "trivial harms" and noting that Title VII does not set forth "a general civility code for the American workplace." *Burlington N. & Santa Fe Ry., Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citation omitted). The purpose of the anti-retaliation provision is to prohibit employer actions that would deter a reasonable employee from reporting discriminatory behavior. However, "[a]n

employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience" because such actions have no legally cognizable deterrent effect. *Id.*

With the foregoing standard in mind, plaintiff has not meet her *prima facie* burden with respect to the allegation of retaliatory shift assignment to work as an operator in the inspection area. It is undisputed that the job responsibilities of a lead operator included working as an operator and that both African–American and non-African-American lead operators were often scheduled to work as operators. No reasonable jury could find that plaintiff's assignment to work as an operator in the inspection area, an assignment that was part of her job responsibilities, one to which she was assigned with regularity prior to her alleged complaint to Wilkinson and one to which employees of all races were assigned, would have a significant deterrent effect on the reporting of race discrimination.

Likewise, the claim that the denial of plaintiff's application for the administrative assistant position was retaliatory fails because plaintiff has not set forth a *prima facie* case. As described in greater detail above, plaintiff has not proved that she engaged in protected conduct and, for that reason alone, dismissal is proper. Yet, even if plaintiff had set forth a *prima facie* case, plaintiff would not be able to carry her ultimate burden. Wyeth has offered a legitimate, non-discriminatory reason for its action, that is, that Uram believed that another applicant was more qualified than plaintiff, and plaintiff has failed to set forth any evidence from which to infer that this reason was a pretext for discrimination.

Because plaintiff has failed to establish that she engaged in a protected activity, thereby precluding her from making a *pri-*

*ma facie* case of retaliation, and because she cannot carry her burden even if she did set forth a *prima facie* case, plaintiff's claim of retaliation cannot withstand the instant motion for summary judgment.

## V. *Constructive Discharge Claim*

 Although plaintiff did not specifically allege constructive discharge in her Complaint, defendant raised this issue in its motion papers and plaintiff responded. We note first that claims of constructive discharge necessarily rely on actionable claims of a hostile work environment. *Nakis v. Potter,* 422 F.Supp.2d 398, 412 (S.D.N.Y.2006) ("[A]fter *Suders,* without an actionable hostile environment claim, a plaintiffs constructive discharge claim must also fail.") (internal quotation marks omitted), *construing Pa. State Police v. Suders,* 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004); *see also Ferraro v. Kellwood Co.,* 2004 WL 2646619, at *7 (S.D.N.Y. Nov. 18, 2004) (A constructive discharge claim may be viewed as an "aggravated case of hostile work environment."). Plaintiff has not made a claim of a hostile work environment and, for that reason alone, dismissal of the constructive discharge claim may be proper. Yet, even without reference to a hostile work environment, plaintiffs constructive discharge claim must be dismissed because plaintiff fails to meet the standard for that claim.

 The standard for constructive discharge is whether "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Suders,* 542 U.S. at 141, 124 S.Ct. 2342. Or, as the Second Circuit has stated, "[c]onstructive discharge occurs when an employer *deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Kader v. Paper Software, Inc.,* 111 F.3d

337, 339 (2d Cir.1997) (quotation marks omitted) (emphasis in original). To show that the employer acted with the requisite intent, plaintiff must "at least demonstrate that the employer's actions were deliberate and not merely negligent or ineffective." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 230 (2d Cir.2004) (internal quotations marks and citation omitted).

■ Plaintiff's deposition testimony is insufficient to support a viable constructive discharge claim. Plaintiff stated that she felt that she was forced to leave Wyeth "based on the scheduling" and because she "was hired as a lead and [was not working as] a lead." (Aspilaire Dep. at 256–57.) No reasonable jury could find that working as an operator, which was part of plaintiffs job as a lead operator, together with plaintiff's displeasure with her job schedule, could give rise to a work environment so hostile that a reasonable person in her position would have felt compelled to resign. Moreover, plaintiff stated that she left Wyeth because she had another job opportunity and that she would have continued to work at Wyeth if she had not been offered the other job. (Aspilaire Dep. at 256–57, 269.)

> Q. Why did you move from Wyeth to Par?
>
> A. Advancement opportunities.
>
> Q. What do you mean by that?
>
> A. Supervisor position, going from an operator to be a supervisor to get into management positions.
>
> Q. So you left Wyeth because you had a better opportunity present itself at Par.
>
> A. At other companies, yes.
>
> . . .
>
> Q. If you didn't get the job at Par Pharmaceuticals what would you have done? You wouldn't have quit Wyeth without having that job, would you?

> A. No.

(*Id.*) No reasonable jury could find that working conditions were so intolerable as to amount to constructive discharge where plaintiff admits that she would have stayed at her job if a better opportunity had not arisen.

■ Finally, courts in this Circuit have held that the availability of alternatives to resignation, such as complaint procedures, may preclude a finding of constructive discharge. *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1157 (2d Cir.1993); *see also Silverman v. City of New York*, 216 F.Supp.2d 108, 115 (E.D.N.Y.2002) ("[C]ourts in this circuit have generally refused to find a constructive discharge where an employee had an avenue through which he could seek redress for the allegedly intolerable work atmosphere . . . but failed to take advantage thereof.") (internal quotation marks omitted). Plaintiff stated that she knew that she had avenues through which she could make a formal complaint of discrimination, but that she does not recall ever having made such a complaint and that while she spoke about her "feelings" with colleagues, she understood that such discussions did not constitute a formal complaint. (Aspilaire Dep. at 60–61.) Plaintiff's decision to resign rather than to pursue alternative avenues, such as Wyeth's formal grievance procedure, precludes a finding that plaintiff's only choice was to resign.

Given plaintiff's candid admissions and in consideration of the evidence proffered, viewed in the light most favorable to her, no reasonable jury could find that Wyeth intentionally forced plaintiff into an involuntary resignation. Therefore, plaintiff's claim of constructive termination cannot withstand defendant's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Doc. # 9) is granted in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendant. The action is dismissed with prejudice and without costs or attorneys' fees.

SO ORDERED.